IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| COURTNEY LUDWIG, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 12 C 6910 |
| v. | ) |
| | ) Magistrate Judge Schenkier |
| CAROLYN W. COLVIN, Acting | ) |
| Commissioner of Social Security,[1] | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER[2]

Plaintiff Courtney Ludwig has filed a motion seeking reversal and remand of the final determination of the Commissioner of Social Security ("Commissioner") denying her application for benefits under Title II of the Social Security Act (doc. # 14). The Commissioner has filed a memorandum in response, requesting that the Court affirm that determination (doc. # 23). For the reasons below, the Court grants Ms. Ludwig's motion.

### I.

Ms. Ludwig submitted her application for disability insurance benefits on January 7, 2009, claiming she became unable to work due to disability as of the alleged onset date of July 13, 2007 (R. 191-92). Her application was denied on February 23, 2009, and upon reconsideration on August 19, 2009 (R. 87, 92). Ms. Ludwig was then granted a hearing before an Administrative Law Judge ("ALJ"), which was held on September 15, 2010 (R. 29). A supplemental hearing was held on March 8, 2011 (R. 63). On June 6, 2011, the ALJ issued a

---

[1]Pursuant to Federal Rule of Civil Procedure 25(d), we have substituted Acting Commissioner of Social Security, Carolyn W. Colvin, as the named defendant.

[2]On November 2, 2012, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including entry of final judgment (docs. ## 7, 10).

written decision finding that Ms. Ludwig was not disabled (R. 11-22). On August 2, 2012, the Appeals Council denied Ms. Ludwig's request for review (R. 1-5), making the ALJ's ruling the final decision of the Commissioner. *See Shauger v. Astrue*, 675 F. 3d 690, 695 (7th Cir. 2012). On August 28, 2012, Ms. Ludwig filed her complaint in this Court seeking review.

## II.

We begin with a summary of the administrative record. We discuss Ms. Ludwig's general background and her medical record in Part A, the testimony from the first hearing in Part B, later submitted evidence in Part C, testimony from the second hearing in Part D, and the ALJ's written opinion in Part E.

### A.

On March 4, 2003, Ms. Ludwig – then 26 years old – suffered a sudden cardiac arrest while tending bar at her parents' tavern (R. 566). Paramedics shocked her nine times in the field, and she was still unconscious when she arrived at the emergency room (*Id.*). Ms. Ludwig likely experienced a period of anoxic encephalopathy (loss of oxygen to the brain) during the cardiac event (R. 551). After her condition stabilized several days later, she was implanted with an ICD ("implantable cardioverter defibrillator") (R. 547). For several years, Ms. Ludwig continued to work multiple jobs as a waitress or bartender (R. 254-55). She last worked full-time in 2007 (R. 209). Ms. Ludwig continued to work part-time in 2008 for friends who accommodated her health issues, and the job did not have a set schedule (R. 46). She has not worked since then.

In August 2006, Ms. Ludwig began treatment with cardiologist Mary Gordon. Ms. Ludwig reported chest pain, fatigue, and hair loss to Dr. Gordon, who prescribed nitroglycerin and ordered a coronary arteriogram (an imaging test to see inside arteries) (R. 592-95). The examination revealed a moderately reduced "ejection fraction" but otherwise normal coronary

arteries (R. 591).³ At that time, Ms. Ludwig was taking atenolol and Norvasc (for blood pressure and chest pain), Topamax (to help prevent migraine headaches), Midrin (for migraine pain), Xanax (for anxiety), and nitroglycerin (for chest pain) (R. 594). Throughout 2007, Ms. Ludwig reported chest pain at some of her office visits with Dr. Gordon, but not others. At her March 2007 appointment, Ms. Ludwig reported chest discomfort and fatigue, and Dr. Gordon opined that Ms. Ludwig had a coronary spasm (R. 698).

Ms. Ludwig got married on July 13, 2007, her alleged onset date (R. 41). After returning from a honeymoon to Germany, she reported to Dr. Gordon on July 30, 2007, that she was feeling "great," and had no complaints of chest pain or any other health issues (R. 691-92). However, she complained of chest pain at her August 10, 2007 visit with Dr. Gordon despite having had a normal echocardiogram; nevertheless, Ms. Ludwig was looking forward to a year-long road trip with her husband (R. 688). She had a follow-up appointment with Dr. Gordon in December 2007 at which she denied any chest pain (R. 684), but on January 13, 2008, she went to the emergency department after having a flutter and pain in her chest (R. 641-42).

Ms. Ludwig next saw Dr. Gordon in August 2008 (R. 676). Dr. Gordon reported that "[f]rom a heart standpoint, she has been feeling well," but Ms. Ludwig continued to have chest pain which had remained constant over the years (R. 677). Ms. Ludwig also complained of "chronic, almost daily headaches," and she reported being too tired to work or exercise (*Id.*). At that appointment, Dr. Gordon substituted propranolol for atenolol and added a prescription for amitriptyline (an anti-depressant) (*Id.*). At an appointment in September 2008, another doctor at the same clinic noted that Ms. Ludwig had ceased taking her migraine medication and that migraines were "not voiced as an active problem" (R. 671). In October 2008, however, she told

---

³Ejection fraction is a measurement of the percentage of blood leaving the heart each time it contracts (*i.e.*, a measure of how well the heart is pumping). http://www.mayoclinic.org/ejection-fraction/expert-answers/faq-20058286.

3

Dr. Gordon that she "continued to have headaches" and fatigue, though she denied having chest pain at that appointment (R. 666). That month, she also had a transesophageal echocardiogram which showed moderate mitral valve prolapse and mild mitral regurgitation (R. 625).[4]

In August 2008, Ms. Ludwig requested an evaluation by a rheumatologist, Dr. Alan Jacobson, who found no evidence of inflammatory arthritis and insufficient evidence to diagnose fibromyalgia because Ms. Ludwig had only slight tenderness and no swelling (R. 683).[5] Ms. Ludwig also had an appointment with an internal medicine physician, Karen Burgner, M.D., in October 2008, at which she reported experiencing chest pain and headaches (R. 662). Ms. Ludwig stated that she had smoked about a pack of cigarettes per day since she was 18 years old, and she was not interested in quitting at that time (R. 663). Ms. Ludwig also reported binge drinking five to six drinks about every two months (*Id.*).

Charles Kenney, M.D., a state agency physician, completed a Physical Residual Functional Capacity ("RFC") Assessment in February 2009 based on the medical record (R. 752). He found Ms. Ludwig's reports of her symptoms "partially credible;" while he agreed that her condition may cause fatigue, he found that her allegations of chest pain were not consistent with the medical evidence, which showed that her cardiac function had been relatively asymptomatic since the defibrillator was implanted (*Id.*). Dr. Kenney further stated that no medical findings supported Ms. Ludwig's allegations of arthritis and joint problems (*Id.*). The assessment indicated that Ms. Ludwig was capable of light work with no other functional limitations (R. 748-52). That same month, Dr. Carl Hermsmeyer, Ph.D., completed a psychiatric

---

[4] Mitral valve prolapse occurs when the valve between the heart's left upper and lower chamber does not close properly, so that the valve bulges upward. http://www.mayoclinic.org/diseases-conditions/mitral-valve-prolapse/basics/definition/con-20024748. Mitral regurgitation happens when the heart's mitral valve does not close tightly, allowing blood to flow backward in the heart. http://www.mayoclinic.org/diseases-conditions/mitral-valve-regurgitation/basics/definition/con-20022644.

[5] Ms. Ludwig had one follow-up appointment with Dr. Jacobson in September 2009 that showed no change (R. 672).

review technique based on Ms. Ludwig's medical records and found no medically determinable mental impairment (R. 733).

In April 2009, Ms. Ludwig told Dr. Gordon that she was not working, sleeping up to 14 hours a day, and experiencing "continuous" chest pain (R. 761). Dr. Gordon also noted a "gradual worsening" in Ms. Ludwig's concentration and cognitive function (*Id.*). However, at a mental status evaluation for the Bureau of Disability Determination Services ("DDS") in July 2009, the assessing psychologist, David NieKamp, Psy.D., found that she had "severe" anxiety but generally unimpaired cognitive function (R. 814).

A state agency medical consultant, Keith Burton, Ph.D., completed a Mental RFC Assessment for Ms. Ludwig in August 2009. After reviewing the medical evidence, Dr. Burton found that Ms. Ludwig's cognitive functions were "intact," and she had no difficulties in maintaining social functioning, mild restriction in her activities of daily living, and no episodes of decompensation of extended duration (R. 825-27). As a result of her anxiety, however, the consultant concluded that Ms. Ludwig had moderate difficulties in maintaining concentration, persistence, or pace (R. 825, 829-30). Nevertheless, Dr. Burton found that overall, Ms. Ludwig had the mental capacity to engage in basic work activities, follow one- or two-step instructions, and do so within the concentration, persistence, and pace required for competitive work (R. 831).

On October 21, 2009, Dr. Gordon wrote a letter stating that Ms. Ludwig suffered from chronic fatigue, chest pain, and significant memory difficulties following her heart attack (R. 891). She wrote that Ms. Ludwig is taking multiple medications and receives the "best medical therapy possible," but that she continues to experience fatigue and chest pain to the point that she is unable to be substantially employed (*Id.*). In addition, Dr. Gordon stated that Ms. Ludwig suffers from disabling migraine headaches on a monthly basis, lasting as long as three to four

days, but Ms. Ludwig cannot take certain preventive medications due to her underlying heart disease (*Id.*).

Ms. Ludwig next went to the emergency department with severe chest pain and confusion in February 2010, and at her follow-up with Dr. Gordon a few days later, she stated that she continued to have chest pain, fatigue, and difficulty sleeping (R. 884). Dr. Gordon changed her dose of Novarsc and started her on prednisone and trazodone (R. 884-85). When Ms. Ludwig saw Dr. Gordon again in April 2010 and reported no improvement, Dr. Gordon referred her to another cardiologist, Dr. Edward Lipman, for a full electrophysiology study (R. 872). Dr. Lipman performed a "cardiac ablation" a few weeks later (R. 867-71).[6] Ms. Ludwig reported some chest pain in the days after the ablation, but it was "much less" than before (R. 867-68).

On August 10, 2010, Ms. Ludwig was briefly admitted to the hospital after an episode of "crushing chest pain which dropped her to her knees" (R. 845). She told hospital physicians that in preceding weeks, she had been experiencing increasing fatigue and chest pain (*Id.*). Testing revealed that Ms. Ludwig had normal coronary arteries, mild reduction in global left ventricular ejection fraction, and mild elevation of the left ventricular end-diastolic pressure (R. 866).[7] At her appointment with Dr. Gordon on August 20, 2010, Ms. Ludwig reported that her symptoms had gradually been getting worse and that her chest pain was once again continuous (R. 857). Dr. Gordon re-prescribed atenolol to try to control the cardiac symptoms (R. 858). That same week, Dr. Gordon wrote a letter again expressing her opinion that Ms. Ludwig's continuing chest

---

[6]Cardiac ablation is a procedure that is used to destroy small areas in the heart that may be causing heart rhythm problems. During the procedure, electrodes are placed inside the heart to measure the heart's electrical activity. These electrodes may also be used to destroy the bad areas of the heart. http://www.nlm.nih.gov/medlineplus/ency/article/007368.htm.

[7]Left ventricular end-diastolic pressure is a measure of the blood pressure in the left ventricle when the heart is at rest between beats. http://www.nhlbi.nih.gov/health/health-topics/topics/hbp/.

pain, migraines, fatigue, and memory difficulties have rendered Ms. Ludwig physically disabled and unable to work since July 2007 (R. 853-54).

On September 17, 2010, Dr. Gordon wrote a follow-up letter discussing the results of the cardiac testing from the preceding month (R. 895). She explained that the reduction in Ms. Ludwig's ventricular ejection fraction could cause a "significant amount of fatigue" and chronic chest pain (*Id.*). In addition, the elevation in her left ventricular end-diastolic pressure is a "well known cause of fatigue, shortness of breath, chest pain and chronic edema" (*Id.*). Furthermore, Dr. Gordon explained that although Dr. Lipman treated Ms. Ludwig's ventricular arrhythmias with radiofrequency ablations on April 22, 2010, it is common for these to recur, and they are a common cause of chest pain (*Id.*). Dr. Gordon also explained that fatigue was a well-known side effect of the medications Ms. Ludwig was taking to treat her heart condition (R. 896).

**B.**

At the first hearing in Ms. Ludwig's case, on September 15, 2010, Ms. Ludwig testified that she suffers from chest pain "mostly all the time, off and on" and that it is sometimes severe enough to put her on her knees (R. 41). She also said that she has migraines so severe that they make her vomit, which last between two and seven days and occur roughly monthly (R. 44).

On a typical day, Ms. Ludwig testified that she wakes up around 3:00 p.m., makes a cup of tea, and then takes a nap while watching television after her husband leaves for work (R. 39). She stated that her mother "insists on babysitting [her]," and her parents usually come to check on her around 10:00 p.m. (R. 40, 42). Her husband usually returns home by 11:30 p.m., and she is in bed between 1:00 a.m. and 3:00 a.m. (*Id.*). Ms. Ludwig does not do laundry, vacuum, take out the garbage, or clean the cat's litter box, but she is able to dust, make the bed, and prepare simple meals (R. 37-39). She said that if she dusts the apartment or does dishes, she must take

frequent breaks and it takes her all day (R. 46). Ms. Ludwig tries to avoid driving, but she testified that she drives about once a week to the store to pick up something small (R. 42).

The medical expert, internist Dr. Ashok Jilhewar, testified next. He detailed the medical record as it related to Ms. Ludwig's impairments, noting that the etiology of her chest pain and fatigue was unknown, he did not have specific documentation of her cognition problems or chronic fatigue, there were no clinical findings of fibromyalgia, and he did not find documentation of appropriate medication management of Ms. Ludwig's migraine headaches (R. 48-52). Dr. Jilhewar found that Ms. Ludwig's cardiomyopathy, migraines, and fatigue did not meet or equal a listing (R. 53). Based on the medical record, he estimated that Ms. Ludwig could perform light work with no exposure to pulmonary irritants (R. 53). However, if he accepted Ms. Ludwig's testimony that she must sleep 12 to 13 hours per day and can only lift 10 pounds, she would be reduced to sedentary work (R. 53-54). Dr. Jilhewar further recommended that Ms. Ludwig avoid a high-stress work environment, which could induce cardiac arrhythmia (R. 54).

Following Dr. Jilhewar's testimony, Ms. Ludwig's attorney requested that her mother testify, but because they were short on time, the ALJ instead invited Ms. Ludwig's mother to submit a written statement (R. 55, 60-61). Her mother later submitted a four-page letter describing her daughter's arthritis-like symptoms, migraine headaches (from which she had suffered since she was a child), and most severe, her heart problems since her 2003 cardiac arrest, which left her constantly exhausted and unable to do simple tasks (R. 386-89).

A vocational expert ("VE") also testified at the hearing. The ALJ asked the VE to consider an individual of Ms. Ludwig's age, education, and work experience who can lift and carry 10 pounds occasionally and less than 10 pounds frequently, who can stand or walk up to a total of two hours and sit at least six hours during an eight-hour workday, and who must avoid

8

concentrated exposure to heights, moving machinery, pulmonary irritants, and temperature extremes, and who is restricted to unskilled, repetitive, three- or four-step tasks (R. 58). The VE replied that such a person – even one that needed to take a one to two minute break each hour and had no contact with the general public – could perform the full range of unskilled, sedentary work (R. 58-59). No jobs would be available for an individual who could not lift up to 10 pounds on an occasional basis or had to be off task 20 percent of the time to rest (R. 59-60).

## C.

The next month, October 2010, Ms. Ludwig traveled to the Mayo Clinic for evaluation of her cardiomyopathy and migraine headaches. She was examined over a period of several days by several doctors, including cardiologist Grace Lin and neurologist Dr. Kumar (R. 932-36). A CT scan was negative (R. 933), and an echocardiogram showed normal ejection fraction, normal ventricular size, and no significant valvular heart disease (R. 930). However, a cardiopulmonary exercise stress test demonstrated significantly decreased peak oxygen consumption, so Ms. Ludwig underwent extensive cardiac catheterization, which showed normal coronary arteries and endothelial function, but abnormal "coronary flow reserve" (*Id.*).[8] Dr. Lin opined that Ms. Ludwig's chest pain may be related to microvascular disease or that her chest pain may be non-cardiac in etiology and perhaps stress-induced or related to chronic pain syndrome (R. 932).

In December 2010 and January 2011, Ms. Ludwig saw a physician at the Center for Pain Management, Dr. F. Hashim, to treat her migraines and radiating, left-sided chest pain, which she described as ranging from a one to ten on a ten-point scale (R. 921). Dr. Hashim prescribed Lyrica (for neuropathic pain and fibromyalgia), and recommended that she continue taking amitriptyline, trazodone, ibuprofen, and Depo-Provera (to prevent menstrual migraines) (R. 927).

---

[8]Coronary flow reserve is a measure of coronary circulation that compares the maximum increase in blood flow through coronary arteries to the normal resting volume. *See* http://www.ncbi.nlm.nih.gov/pubmed/10756243; http://www.ncbi.nlm.nih.gov/pubmed/21551277.

9

Ms. Ludwig again complained of severe chest pain and fatigue to Dr. Gordon on March 1, 2011 (R. 957), but a stress echocardiogram turned up normal results, with Ms. Ludwig denying "chest pain, tightness, or pressure throughout [the] test" (R. 953).

### D.

The ALJ held a supplementary hearing on March 8, 2011, to hear testimony from a second medical expert, cardiologist Sheldon Slodki (R. 65). Dr. Slodki found after a review of Ms. Ludwig's medical records that she did not meet or equal a listing based on any of her cardiac symptoms going back to the alleged onset date (R. 71-74). He agreed with Dr. Kinney's Physical RFC Assessment finding that Ms. Ludwig was able to perform light work, as long as she was not exposed to environmental hazards (R. 74-75). Dr. Slodki acknowledged that Ms. Ludwig's heart medications could cause fatigue (R. 76-77).

Ms. Ludwig also testified briefly regarding her migraine headaches, from which she had suffered since she was a child (R. 79). She stated that she had disabling migraine headaches at least once per month, lasting usually three to five days at a time (*Id.*).

The ALJ then heard testimony from a second VE. The ALJ asked the VE to consider an individual similarly situated to Ms. Ludwig who is restricted to sedentary work; must avoid even moderate exposure to work hazards; can only occasionally climb ramps and stairs, balance, stoop, crouch, kneel, and crawl; should avoid concentrated exposure to pulmonary irritants and temperature extremes; and needed a sit-stand option allowing her to stand for one to two minutes every hour (R. 81-82). The VE responded that such a person could perform work as a data entry clerk or office manager (*Id.*). If restricted to three- or four-step simple, repetitive tasks, the individual could work as an order clerk, seated cashier, or surveillance system monitor (R. 82).

No jobs would be available if the individual were off task 10 percent of the time or more, or had to miss two or more days of work per month due to fatigue or headaches (R. 83).

E.

In an opinion dated June 6, 2011, the ALJ determined that Ms. Ludwig was not disabled under the standard five-step sequential evaluation. At Step 1, the ALJ determined that Ms. Ludwig had not engaged in substantial gainful activity since her alleged onset date of July 13, 2007, although she had worked regularly on a part-time basis as a waitress after that date (R. 13).

At Step 2, the ALJ found that Ms. Ludwig's history of cardiac arrest with dilated cardiomyopathy, ICD implantation, migraine headaches, and anxiety were severe impairments (R. 13). The ALJ reviewed Ms. Ludwig's cardiac history, including her heart attack in 2003, normal echocardiograms in June and August 2007, intermittent chest pain and palpations throughout 2008 (for which she took nitroglycerine three or four times a year), and an October 2008 transesophageal echocardiogram showing moderate mitral valve prolapse and mild mitral regurgitation but otherwise normal (R. 14). The ALJ also noted that she had an ICD revision in 2009 and cardiac ablation therapy in spring 2010 which "successfully addressed" her complaints of frequent palpitations (*Id.*). The ALJ stated that in August 2010, Ms. Ludwig was admitted to the hospital with "increased fatigue," and in October 2010, she saw Dr. Lin at the Mayo Clinic due to her "constellation of symptoms" (*Id.*). The ALJ reviewed the results of Dr. Lin's testing suggesting microvascular dysfunction, but the ALJ noted that a March 2011 exercise stress test showed normal sinus rhythm (*Id.*).

The ALJ also reviewed Ms. Ludwig's history of "ongoing" migraine headaches (R. 14). The ALJ noted that on September 23, 2008, Ms. Ludwig reported no longer taking migraine

medications, but her headaches increased after she used nitroglycerine (*Id.*). She also consulted a neurologist at the Mayo Clinic, but a CT scan of her head was negative (*Id.*).

As for Ms. Ludwig's mental impairments, the ALJ explained that she had attention, concentration, and memory problems after her cardiac arrest, but at a June 2009 mental status evaluation, her memory was intact for immediate and remote recall and for factual information and events, and she could do simple calculations (R. 15-16). Ms. Ludwig was oriented, but "very anxious," and she has taken alprazolam for anxiety on an as-needed basis (R. 16).

The ALJ determined that Ms. Ludwig's alleged dizziness was not severe because she drove, shopped, and ambulated without assistance; nevertheless, the ALJ accommodated Ms. Ludwig's "intermittent" dizziness by placing restrictions on her exposure to workplace hazards in the RFC (R. 15). The ALJ found no evidence that Ms. Ludwig's alleged joint pain caused any work-related limitations because she had full range of motion and strength in her joints, and no doctor found evidence of fibromyalgia, rheumatoid arthritis, or other inflammatory disease (*Id.*). The ALJ also concluded that Ms. Ludwig's complaints of fatigue and sleepiness did not constitute a medically determinable impairment because there were no specific clinical findings, and her cardiologist suggested she do aerobic exercise (*Id.*).

At Step 3, the ALJ determined that Ms. Ludwig's impairments do not meet or medically equal a listed impairment, specifically Listings 4.02, 4.04, and 4.05 for cardiac impairments and Listing 11.00 for neurological disorders (R. 16). The ALJ concluded that Ms. Ludwig's mental impairment does not satisfy the Paragraph B criteria. She determined that Ms. Ludwig had: (1) mild restrictions in activities of daily living because she was able to take a trip to Germany and travel throughout the United States, work regularly on a part-time basis, and prepare simple

meals, drive, shop, and clean the litter box;[9] (2) mild restrictions in social functioning because she lives in an apartment with her husband, has good marital and family relationships, is well-groomed and pleasant, and recently worked as a waitress and bartender; and (3) moderate difficulties with concentration, persistence, or pace (R. 16-17).

The ALJ then determined that Ms. Ludwig had the RFC to perform sedentary work with some restrictions, specifically, "she can never climb ladders, ropes, and scaffolds, and only occasionally climb ramps and stairs, balance, stoop, crouch, kneel and crawl. She must avoid even moderate exposure to temperature extremes, pulmonary/lung irritants and to work hazards such as unprotected heights and dangerous moving machinery. She can perform jobs involving three to four step simple repetitive unskilled routine tasks. She must be able to stand for one or two minutes after one hour of sitting" (R. 17).

Though Ms. Ludwig and her mother reported that she suffered from frequent, severe fatigue, chest pain, and migraines, the ALJ found that her allegations as to the intensity, persistence and limiting effects of her symptoms were not credible "to the extent that they are inconsistent" with the RFC (R. 18-19). The ALJ explained that she found Ms. Ludwig unconvincing with regard to her cardiac issues because she continued to drink alcohol and smoke cigarettes against her doctors' recommendations (R. 19). In addition, the ALJ was skeptical that Ms. Ludwig became disabled on the day of her wedding, after which she honeymooned in Germany, took a year-long cross-country road trip, and worked part-time as a bartender (*Id.*). The ALJ also found that Dr. Gordon's progress notes belied Ms. Ludwig's disability claims because at some appointments in 2007, 2008, and 2009, Ms. Ludwig did not experience chest pain, palpitations, or fatigue, and Dr. Gordon encouraged her to do aerobic exercise (*Id.*).

---

[9]This finding contrasts with Ms. Ludwig's testimony that she does not clean the litter box (R. 39).

The ALJ also found Ms. Ludwig's complaints of fatigue unavailing because she worked part-time "quite consistently" since her alleged onset date, maintained a daily schedule, and could perform basic household tasks including small errands (R. 19-20). Nevertheless, the ALJ accommodated for Ms. Ludwig's complaints of poor stamina and chest pain with activity by limiting her to sedentary work (R. 20). The ALJ also rejected Ms. Ludwig's testimony that she "has headaches three to five days a week and cannot do anything at all on those days" because the ALJ found no objective medical evidence supporting that assertion, such as treatment notes, test results, or emergency department visits (*Id.*).

The ALJ gave "some weight" to the opinions of Ms. Ludwig's treating cardiologist, Dr. Gordon, with regard to Ms. Ludwig's cardiac history (R. 20). However, the ALJ gave "greater weight" to Dr. Slodki's testimony that Ms. Ludwig was treated "quite successfully with an ICD, and subsequent cardiac testing [] failed to reveal disabling problems" (R. 20-21). Although Dr. Slodki agreed with the DDS consultants that Ms. Ludwig could perform a restricted range of light work, the ALJ limited Ms. Ludwig to sedentary work due to her cardiac impairments (*Id.*).

The ALJ then determined that Ms. Ludwig's condition rendered her unable to perform any past relevant work, but that there were still a significant number of jobs that Ms. Ludwig could perform (R. 21-22). Thus, the ALJ concluded that Ms. Ludwig was not disabled (R. 22).

**III.**

We will uphold an ALJ's decision "if it is supported by substantial evidence, meaning evidence a reasonable person would accept as adequate to support the decision." *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012). The ALJ does not have to address every piece of evidence presented, but she does have to provide "an accurate and logical bridge between the evidence and her conclusion that the claimant is not disabled." *Id.* (internal quotation marks

omitted). Here, Ms. Ludwig argues – among other things – that the ALJ's decision to give her treating physician's opinion only some weight was not supported by substantial evidence (doc. # 15: Pl.'s Mem. in Supp. of Summ. J. at 14).

It is well-settled that as long as the treating physician's opinion is supported by medically acceptable clinical and diagnostic techniques and is not inconsistent with substantial evidence, the ALJ should give it controlling weight. *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010). Although the ALJ is not required to address all of the medical evidence, *Kastner*, 697 F.3d at 636, she must offer "good reasons" for not giving controlling weight to the treating physician's opinion. *Campbell*, 627 F.3d at 306. Conclusions that ignore relevant evidence do not qualify as good reasons. *See Id.* at 306-07. Thus, the ALJ is not permitted to "cherry-pick" only the facts that support her conclusion. *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010).

Dr. Gordon, Ms. Ludwig's treating cardiologist, provided progress reports and written opinions on Ms. Ludwig's impairments – most notably, her fatigue, chest pain, and migraines – and the functional limitations caused by these impairments. Contrary to the government's contention (doc. # 23: Gov.'s Mem. in Opp'n at 3), Dr. Gordon's opinions went beyond the ultimate question of disability (an issue we agree is reserved to the Commissioner). Dr. Gordon offered opinions about Ms. Ludwig's conditions and resulting physical limitations that the ALJ was required to address before discounting Dr. Gordon's opinions. For the reasons we explain below, we conclude that the ALJ failed to do so.

### A.

With regard to Ms. Ludwig's chest pain, the ALJ's explanation of why she gave more weight to Dr. Slodki than Dr. Gordon omits several relevant medical reports and opinions from Dr. Gordon. The ALJ enumerates Ms. Ludwig's appointments with Dr. Gordon from July 2007

to May 2009 where she denied experiencing chest pain, but omits the appointments where Ms. Ludwig complains of chest pain. For example, the ALJ jumps from the September 4, 2007 appointment, where Ms. Ludwig said she was experiencing no chest pain, to the December 13, 2007 appointment, where she also did not have chest pain (R. 19), omitting the intervening appointment on October 7, 2007, where Ms. Ludwig did complain of chest pain. The ALJ repeats this selective recounting of the evidence in her discussion of Ms. Ludwig's 2008 appointments, noting that Ms. Ludwig did not complain of chest pain at an appointment in September 2008, but failing to mention several other appointments that year when she did complain of chest pain (*Id.*). In addition, although Ms. Ludwig saw Dr. Gordon multiple times between 2009 and 2011, the ALJ's explanation for why she discounted Dr. Gordon's opinion includes only one of those appointments: the May 2009 appointment where Ms. Ludwig said she was not experiencing chest pain that day (*Id.*). The ALJ's opinion omitted Dr. Gordon's treatment notes from other 2009, 2010, and 2011 appointments, where Dr. Gordon explicitly mentioned Ms. Ludwig's worsening chest pain.

Likewise, in stating that Ms. Ludwig's cardiac ablation procedure in April 2010 successfully treated her heart problems, and that subsequent cardiac testing failed to reveal disabling problems, the ALJ did not address Dr. Gordon's opinion that it was common for chest pain to recur after cardiac ablation, and that the results of the cardiac testing, while showing only mild to moderate problems, could cause Ms. Ludwig serious functional limitations (R. 895). The ALJ skipped over the evidence that Ms. Ludwig was admitted to the hospital with severe chest pain and confusion in February 2010, and that on August 10, 2010, she was again admitted after an episode of "crushing chest pain which dropped her to her knees" (R. 845).[10]

---

[10]We recognize that there is evidence in the record that suggests that Ms. Ludwig's complaints of chest pain may no longer stem from a cardiac condition; specifically, the October 2010 Mayo Clinic evaluation stating that Ms.

16

The ALJ chose to place more weight on the opinion of the medical expert at the second hearing, Dr. Slodki, than on the opinions of Dr. Gordon with respect to the level of limitation caused by Ms. Ludwig's chest pain (R. 21). However, for the reasons we have explained above, that choice was based on an examination of the evidence that was too selective to constitute the necessary "good reasons" for not giving controlling weight to the treating physician's opinion. *Campbell*, 627 F.3d at 306-07. Thus, at this time, we cannot find that the ALJ's decision to give greater weight to the medical expert than to Ms. Ludwig's long-time treating cardiologist was supported by substantial evidence.[11]

**B.**

In addition, the ALJ did not adequately explain her reasons for not giving controlling weight to Dr. Gordon's opinion on Ms. Ludwig's complaints of fatigue. The ALJ concluded that Ms. Ludwig's complaints of fatigue and sleepiness were not a medically determinable impairment because there were no specific clinical findings, and Dr. Gordon suggested she do aerobic exercise (R. 15). This analysis falls short for several reasons.

*First*, the ALJ does not explain what clinical findings she would look to that might show fatigue. *Second*, Dr. Gordon explained that despite recommending aerobic exercise to Ms. Ludwig, Ms. Ludwig reported that she was too exhausted to do it. The ALJ's opinion ignores

---

Ludwig's chest pain may be the result of stress or chronic pain syndrome (R. 932). But the ALJ did not address that evidence, so we do not know whether or how it influenced her analysis.

[11]The Commissioner points out that an ALJ may discount or reject the opinion of a treating physician when the ALJ finds that he or she has provided "overly-sympathetic disability assessments" (Def.'s Mem. at 4, citing *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008); *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001)). But, an ALJ must provide some evidentiary basis for such finding, because if an ALJ may reject or discount a treating physician's opinion based merely on generalized skepticism about the impartiality of treating physicians, it could swallow the general rule that a treating physician's opinion is controlling so long as it is not inconsistent with substantial evidence. In any event, here the ALJ did not state that she found physician bias, and so any attempt by the Commissioner to offer that ground as a basis for affirmance is barred under the *Chenery* doctrine. *See Roddy v. Astrue*, 705 F.3d 631, 637 (7th Cir. 2013) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943) (holding that the Commissioner may not defend the ALJ's decision using a rationale that the ALJ did not employ in his or her opinion)).

17

that evidence. *Third*, Dr. Gordon did not simply report Ms. Ludwig's subjective complaints of fatigue, but also explained the medical basis for her fatigue. While an ALJ may reject the treating physician's opinion if that opinion is based "solely on the patient's subjective complaints," *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008), Dr. Gordon's opinion was based on more than that. Dr. Gordon explained that Ms. Ludwig's fatigue was to be expected from the medications she was taking for her heart problems (R. 896). In addition, she explained that the results shown in cardiac testing – specifically, the reduction in ventricular ejection fraction and the elevation in left ventricular end-diastolic pressure – could cause Ms. Ludwig a "significant amount of fatigue" (R. 895).[12]

## C.

Finally, the ALJ's treatment of Ms. Ludwig's migraine headaches was also deficient. *First*, the ALJ mischaracterized Ms. Ludwig's subjective complaints. The ALJ wrote that she found no evidence to support an assertion that Ms. Ludwig experienced migraines three to five days per week (R. 20). But, Ms. Ludwig testified that she experienced migraines monthly, lasting three to five days at a time (R. 79). That was generally consistent with what she described to Dr. Gordon during treatment (*see* R. 891). *Second*, while the ALJ noted that Ms.

---

[12]The ALJ acknowledged that the medical expert, Dr. Slodki, confirmed Dr. Gordon's statements that Ms. Ludwig's medications could cause fatigue (R. 19). However, the ALJ believed that Ms. Ludwig's fatigue was "overstated" because she engaged in extended travel in 2007 and 2008, had "worked quite consistently" since her alleged onset date, and could perform certain household tasks (R. 19-20). However, the ALJ did not acknowledge that Ms. Ludwig worked only upon returning from her travels in 2008; did not have a regular schedule, as she was working for friends who accommodated her health issues; and stopped working entirely in 2008 (R. 46, 209). While the ALJ is surely entitled to consider with skepticism Ms. Ludwig's claim that she became disabled as of the date she got married but then left for a European honeymoon and a year of extended domestic travel, on remand, the ALJ must explain why that evidence from 2007 and 2008 trumps later evidence concerning Ms. Ludwig's condition. In addition, the kind of activities of daily living the ALJ cited – reading, watching television, washing dishes, folding laundry, caring for a cat (but not cleaning the litter box, as the ALJ erroneously stated), going on Facebook, and occasionally leaving her residence to get milk or go to the mall (R. 18, 20) – are a dubious barometer of Ms. Ludwig's ability to sustain full-time employment on a consistent basis, especially in light of Ms. Ludwig's testimony that it takes her all day to dust the apartment or clean dishes because she must take frequent breaks (R. 46). *See Roddy*, 705 F.3d at 639 (holding that "a person's ability to perform daily activities, especially if that can be done only with significant limitations, does not necessarily translate into an ability to work full-time").

18

Ludwig reported no longer taking migraine medications as of September 23, 2008, the ALJ did not address Dr. Gordon's explanation that Ms. Ludwig cannot take certain preventive medications due to her underlying heart disease (R. 891). *Third*, the ALJ failed to consider the treatment for migraine pain that Ms. Ludwig sought from Dr. Hashim at the Center for Pain Management as well as Dr. Gordon's numerous attempts to treat Ms. Ludwig's migraine headaches.

We understand that Ms. Ludwig says her migraine headaches have been a problem for many years, beginning well before her alleged onset date of disability (R. 79). That is relevant to whether that condition, which the ALJ found to be a severe impairment (R. 13), is disabling in and of itself. But even if the migraine headaches are not disabling standing alone, that severe impairment is one the ALJ must consider along with Ms. Ludwig's other conditions in determining whether in combination they render Ms. Ludwig disabled. *See Lott v. Colvin*, 541 Fed. App'x 702, 706 (7th Cir. 2013).

## CONCLUSION

For the foregoing reasons, this Court grants Ms. Ludwig's motion (doc. # 14) and remands for proceedings consistent with this opinion. This case is terminated.[13]

ENTER:

_____
**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

**DATE: March 27, 2014**

---

[13] In light of our decision, we do not consider the other arguments raised by plaintiff.